FILED

2016 Sep-27  AM 10:02
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHWESTERN DIVISION

| | | |
|---|---|---|
| James Steven Scott, *et al.*, | } | |
| | } | |
| Plaintiffs, | } | |
| | } | |
| v. | } | Case No.:  3:14-cv-01034-MHH |
| | } | |
| Officer Kyle Palmer, *et al.*, | } | |
| | } | |
| Defendants. | } | |
| | } | |

## MEMORANDUM OPINION AND ORDER

Plaintiff James Scott alleges that defendant Sergeant Kyle Palmer violated his rights under the Fourth Amendment and Alabama law when Sergeant Palmer arrested him in a church parking lot.  (Doc. 1, pp. 7–9).  Plaintiff Carolyn Scott also asserts a claim against Sergeant Palmer under Alabama law.  (Doc. 1, ¶ 6.7).  Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Sergeant Palmer has asked the Court to enter judgment in his favor on the Scotts' claims.  (Doc. 41).  For the reasons stated below, the Court grants in part and denies in part the motion for summary judgment.

## I.       SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  To demonstrate that there is a genuine dispute as to a material fact that precludes summary judgment, a party opposing a motion for

summary judgment must cite "to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

When considering a summary judgment motion, the Court must view the evidence in the record in the light most favorable to the non-moving party and draw reasonable inferences in favor of the non-moving party. *White v. Beltram Edge Tool Supply, Inc*., 789 F.3d 1188, 1191 (11th Cir. 2015). Accordingly, the Court presents the facts in this opinion in the light most favorable to Mr. and Mrs. Scott. *See White*, 789 F.3d at 1191; *see also Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1252 (11th Cir. 2013) ("[W]hen conflicts arise between the facts evidenced by the parties, [courts] must credit the nonmoving party's version.").

## II.    FACTUAL BACKGROUND

The incident that gave rise to the Scotts' claims took place as Mr. and Mrs. Scott were leaving a service at their church. (Doc. 38-1, pp. 68, 124).[1] Sergeant Palmer visited the church to investigate a call concerning a missing child. The mother of the child had called the Red Bay Police Department (RBPD) earlier in the day to

---

[1] Citations to depositions in the record refer to the page numbers of the respective deposition transcripts rather than the corresponding CM/ECF page numbers.

report her 7-year-old daughter missing, and Sergeant Palmer was one of the law enforcement officers assigned to the case.  (Doc. 42, p. 2; Doc. 38-26, ¶ 5).

Soon after the RBPD received the call about the missing child, officers went to the child's home to investigate the call.  (Doc. 42, p. 2–4; Doc. 38-16, ¶¶ 3–4).  The child's father told one of the officers that his daughter may have gone to Hurricane Creek Missionary Baptist Church with neighbors.  (Doc. 42, p. 4; Doc. 38-16, ¶¶ 5–6).  Hurricane Creek Missionary Baptist Church sits approximately three miles outside of the Red Bay city limits and a mile and a half outside of the jurisdiction of the RBPD, but both the church and the City of Red Bay are located in Franklin County.  (Doc. 42, p. 4; Doc. 38-4, pp. 38–39).  Because no Franklin County sheriff's deputy was immediately available to visit the church, RBPD Chief Janna Jackson directed defendant Sergeant Kyle Palmer to go there to look for the missing child.  (Doc. 42, p. 5; Doc. 38-16, ¶ 6).

When Sergeant Palmer arrived at the church, a service had just ended.  (Doc. 42, p. 6; Doc. 38-3, p. 34).  Congregation members were either exiting the church or lingering nearby in conversation.  (Doc. 42, p. 6; Doc. 38-3, p. 34).  Sergeant Palmer approached the missing girl's neighbor, who identified the girl and confirmed that the child had indeed accompanied her and her husband to that evening's service.  (Doc. 38-1, pp. 71–72; Doc. 38-5, p. 26; Doc. 42, p. 7).  Having located the child, Sergeant Palmer returned to his patrol vehicle to radio the good news.  (Doc. 42, p. 8; Doc. 38-3, p. 41).  The child's neighbors joined him a few minutes later.  (Doc. 42, p. 8; Doc.

3

38-3, pp. 41–42, 47).  Standing near his vehicle, Sergeant Palmer and the neighbors made arrangements to return the child to her family.  (Doc. 42, p. 10; Doc. 38-3, pp. 48–49).  According to one of the neighbors who gave a statement to the investigating sheriff following these events, Sergeant Palmer told her that "everything was ok." (Doc. 38-17, p. 11).

Meanwhile, Mr. Scott was walking from the church's fellowship hall to his vehicle to stow some of his wife's belongings.  (Doc. 42, p. 11; Doc. 38-2, p. 47). When he was done, Mr. Scott approached a friend, who told Mr. Scott that Sergeant Palmer was present at the church.  (Doc. 42, p. 11; 38-2, pp. 47–48).  As a church deacon, Mr. Scott felt it was his duty to determine why Sergeant Palmer was there. (Doc. 42, p. 12; Doc. 38-1, p. 82).

Mr. Scott walked toward Sergeant Palmer and the child's neighbors, stopped approximately three feet from Sergeant Palmer, and asked, "[w]hat's going on?"[2] (Doc. 38-2, pp. 72–73).  Sergeant Palmer stated that he had things under control and the best thing for Mr. Scott to do was "[g]et back up yonder and shut up."  (Doc. 38-2, p. 73).  Mr. Scott asked, "[a]re you not a little out of your jurisdiction?"  (Doc. 38-2, p. 74).  Sergeant Palmer replied, "I go anywhere I want to go."  (Doc. 38-2, p. 74).

_____

[2] The parties dispute exactly where Mr. Scott was when he first addressed Sergeant Palmer. Sergeant Palmer testified that Mr. Scott stepped between him and the child's neighbors while they were speaking.  (Doc. 38-3, p. 54).  Mr. Scott testified that the neighbors were ten to twelve feet away from Sergeant Palmer and that he did not step between them.  (Doc. 38-2, pp. 68–69). Because the Court is reviewing Sergeant Palmer's motion for summary judgment, the Court "construe[s] the facts in the light most favorable to Plaintiffs and accept[s] the statements of" Mr. and Mrs. Scott.  *Carter v. Butts County*, 821 F.3d 1310, 1316 n. 3 (11th Cir. 2016); *see supra*, p. 2.

Mr. Scott then remarked, "[y]eah, but this is Franklin County.  We got a county sheriff that, you know, works this part of the county." (Doc. 38-2, pp. 74–75).

The situation escalated when Sergeant Palmer stepped toward Mr. Scott and shoved him with two hands, causing Mr. Scott to move backwards.  (Doc. 38-2, p. 75).  Mr. Scott stepped back toward Sergeant Palmer and repeated, "[y]eah, but you're – this is Franklin County, and we got county law down here."  (Doc. 38-2, pp. 75–76). Sergeant Palmer responded by telling Mr. Scott that he was under arrest.  (Doc. 38-2, pp. 76).  Sergeant Palmer placed one of Mr. Scott's arms in handcuffs.  (Doc. 38-2, pp. 76; *see also* Doc. 38-1, p. 91).  Mr. Scott asked Sergeant Palmer to loosen the cuff because it was too tight.  (Doc. 38-2, pp. 83–85).  Sergeant Palmer responded by kicking Mr. Scott's legs out from under him and pinning Mr. Scott face-down on the ground.  (Doc. 38-2, pp. 83–85).

While on the ground, Sergeant Palmer repeatedly struck Mr. Scott in the back with his knees and pushed Mr. Scott's head down while he attempted to cuff Mr. Scott's free arm.  (Doc. 38-2, p. 86; Doc. 38-11, p. 76; Doc. 38-12, p. 41–42). Mrs. Scott testified that Sergeant Palmer was sitting on him with his knee in Mr. Scott's back and a hand on Mr. Scott's head, "pressing his face in the dirt." (Doc. 38-1, pp. 91, 98).[3]  Sergeant Palmer contends that Mr. Scott refused to be handcuffed, but Mr.

---

[3] Sergeant Palmer denies that he pushed Mr. Scott's head into the ground and that he kicked Mr. Scott's legs from under him.  (Doc. 38-3, p. 70).  He testified that Mr. Scott pulled away when he was handcuffed and this caused Sergeant Palmer to lose his balance and fall to the ground with Mr. Scott.  (Doc. 38-3, p. 66; Doc. 42, p. 31).  The Court assumes the truth of Mr. Scott's testimony for purposes of this opinion.  *See supra*, p. 2 and n. 2.

Scott maintains that he was unable to cooperate because his arm was pinned beneath him.  (Doc. 38-3, p. 67; Doc. 38-2, p. 90).  Mrs. Scott confirmed that Mr. Scott's left arm was "buried up underneath" him.  (Doc. 38-1, p. 92).  She explained that Mr. Scott "was laying on his arm, and then Sergeant Palmer was on top of him."  (Doc. 38-1, p. 92).  She heard her husband say to Sergeant Palmer, "I'm not resisting.  I just can't breathe."  (Doc. 38-1, p. 91).[4]

During the struggle, which was witnessed by approximately twenty members of the congregation, Sergeant Palmer pulled his gun and pointed it toward the congregants who had gathered, and Sergeant Palmer threatened to use his Taser on both Mr. and Mrs. Scott.  (Doc. 38-1, pp. 93, 96, 102, 108; Doc. 38-2, p. 126; Doc. 38-17, pp. 8-11).  Mrs. Scott testified that Sergeant Palmer "kept saying, 'I'm going to tase you.  I'm going to tase you.'"  (Doc. 38-1, p. 93).  The record indicates that none of the congregants had a weapon.  (Doc. 38-1, p. 124).  According to Mrs. Scott, she was trying to make Sergeant Palmer aware of Mr. Scott's health conditions.  Mrs. Scott stated:

> I was telling Sergeant Palmer about Steve's health condition.  I was explaining that he had COPD.  He had emphysema.  He had had back surgery.  He had also had a stomach surgery back just a few months prior to that.  And I was trying to get him off of him.

---

[4] In a sworn declaration prepared for purposes of this litigation, Deputy Sheriff Holcombe stated that he told Mr. Scott while Mr. Scott was on the ground that he had to give Sergeant Palmer his left arm so that Sergeant Palmer could finish cuffing him, but Mr. Scott refused to cooperate. (Doc. 38-17, p. 3).  Again, the Court views the evidence in the light most favorable to Mr. Scott, but the Court mentions this declaration to illustrate that the evidence regarding Mr. Scott's conduct is disputed.

(Doc. 38-1, p. 95; *see also* Doc. 38-1, p. 101–02).  After a few minutes on the ground, Sergeant Palmer successfully handcuffed Mr. Scott and allowed him to stand.  (Doc. 38-2, p. 115; Doc. 38-11, p. 76).

Mr. Scott was helped to his feet by a few spectators, including Franklin County Sheriff's Deputy Clint Holcombe, who had arrived while Mr. Scott and Sergeant Palmer were on the ground.  (Doc. 38-1, p. 105; Doc. 38-2, p. 109; Doc. 38-3, p. 77). Deputy Holcombe removed the cuff from Mr. Scott's right arm.  (Doc. 38-2, p. 109). Someone from the congregation retrieved a chair from the church and brought it outside so that Mr. Scott could sit down.  (Doc. 38-2, p. 110).  Mrs. Scott testified that her husband's face was bleeding and his right wrist was "bleeding profusely" from the handcuff.  (Doc. 38-1, p. 98).[5]  He had a knot on his right wrist and a knot on his elbow.  (Doc. 38-1, p. 111).  Shortly thereafter, an ambulance arrived and took Mr. Scott to the hospital.  (Doc. 38-2, p. 113; Doc. 38-1, p. 112; Doc. 42, p. 21).

The next day, Mr. Scott's regular physician observed abrasions on Mr. Scott's arms indicative of trauma, bruising on Mr. Scott's right rib cage, and tenderness in Mr. Scott's chest wall.  (38-18, pp. 15–16).  A couple of weeks later, the bruising on Mr. Scott's right side was still present.  (Doc. 38-18, p. 17).  Mr. Scott also reported intermittent numbness in his right thumb and pain in his right foot and ankle.  (Doc.

---

[5] Mrs. Scott explained that Mr. Scott bled heavily because he was on blood thinners.  According to Mrs. Scott, after Sergeant Palmer released Mr. Scott, Sergeant Palmer remarked, "I want to know if you got some kind of serious illness because you've bled all over me."  (Doc. 38-1, p. 109).

38-2, pp. 142–43).  Mr. Scott stated that emergency room personnel told him the day

of his arrest that these symptoms were due to nerve damage.  (Doc. 38-2, pp. 142–43,

145).  Following his visits to the hospital and his physician, Mr. Scott participated in

physical therapy for the pain in his foot.  (Doc. 38-2, pp. 143–44).

## III.   DISCUSSION

### A.   Mr. Scott's § 1983 False Arrest and Excessive Force Claims

Mr. Scott alleges that Sergeant Palmer violated his Fourth Amendment rights

by arresting him without probable cause and using excessive force during the arrest.

*See* U.S. CONST. amend. IV; (Doc. 1, pp. 7–8; Doc. 50, pp. 13, 23).  42 U.S.C. § 1983

provides a cause of action to a plaintiff like Mr. Scott when a state actor deprives him

of "any rights, privileges, or immunities secured by the Constitution and laws."  42

U.S.C. § 1983.  Sergeant Palmer asks the Court to enter judgment in his favor on Mr.

Scott's § 1983 claims because, he argues, he is entitled to qualified immunity and

because Mr. Scott cannot show that Sergeant Palmer violated his constitutional rights.

(Doc. 42, p. 23).

Qualified immunity is an affirmative defense, the availability of which is a

"question of law for the court to determine."  *Stone v. Peacock*, 968 F.2d 1163, 1165

(11th Cir. 1992) (quoting *Ansley v. Heinrich*, 925 F.2d 1339, 1341 (11th Cir. 1991))

(internal quotation marks omitted).  "Qualified immunity protects police officers from

suit in their individual capacities for discretionary actions performed in the course of

their duties."  *Carter v. Butts County*, 821 F.3d 1310, 1318 (11th Cir. 2016).

"'Qualified immunity offers complete protection for government officials sued in their individual capacities if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Brown v. City of Huntsville, Ala.*, 608 F.3d 724, 733 (11th Cir. 2010) (quoting *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir 2002)) (internal quotation marks omitted). Qualified immunity allows government officials, including police officers, "'to carry out their discretionary duties without the fear of personal liability or harassing litigation, protecting from suit all but the plainly incompetent or one who is knowingly violating the federal law.'" *Brown*, 608 F.3d at 733 (quoting *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002)). "Qualified immunity 'does not offer protection if an official knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the [plaintiff].'" *Carter*, 821 F.3d at 1319 (quoting *Holmes v. Kucynda,* 321 F.3d 1069, 1077 (11th Cir. 2003), in turn quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 815 (1982)) (alteration provided by *Holmes*).

An officer asserting entitlement to qualified immunity "must first prove that he was acting within the scope of his discretionary authority." *Lee*, 284 F.3d at 1194 (quoting *Courson v. McMillian*, 939 F.2d 1479, 1487 (11th Cir. 1991)) (internal quotation marks omitted). An officer acts within the scope of his discretionary authority when his actions "(1) [are] undertaken pursuant to the performance of his duties and (2) [are] within the scope of his authority." *Roberts v. Spielman*, 643 F.3d

899, 903 (11th Cir. 2011) (quoting *Jordan v. Doe*, 38 F.3d 1559, 1566 (11th Cir. 1994)) (internal quotation marks omitted).

The focus is not whether the acts in question "involved the exercise of actual discretion, [but] whether they are of a type that fell within the employee's job responsibilities." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1265 (11th Cir. 2004) (asking "whether the government employee was . . . performing a legitimate job-related function . . . through means that were within his power to utilize"). To be eligible for qualified immunity, "the defendant must have been performing a function that, *but for* the alleged constitutional infirmity, would have fallen within his legitimate job description." *Id.* at 1266 (emphasis in original).

The evidence shows that Sergeant Palmer was acting within the scope of his discretionary authority when he arrested Mr. Scott.[6] It is undisputed that, at the time of the arrest, Sergeant Palmer was outside the police jurisdiction of the RBPD. (Doc. 50, p. 14; Doc. 38-3, p. 28; Doc. 38-4, p. 39–40). However, under Alabama law, a municipal police officer's authority to make warrantless arrests extends throughout the county containing the city that employs the officer. ALA. CODE § 15-10-1 (1975); *Moore v. Crocker*, 852 So.2d 89, 90–92 (Ala. 2002). Both the City of Red Bay, Alabama—Sergeant Palmer's employer—and the church where the arrest took place are in Franklin County. As an employee of the City of Red Bay, Sergeant Palmer has

---

[6] Mr. Scott does not specifically allege that Sergeant Palmer acted outside the scope of his discretionary authority in arresting him. However, because Mr. Scott calls attention to the fact that Sergeant Palmer made the arrest outside the police jurisdiction of the RBPD, the Court will address this threshold matter. (Doc. 50, p. 14).

authority to make warrantless arrests in Franklin County.  *See* ALA. CODE § 15-10-1 (1975); *Moore*, 852 So.2d at 90–92; *see also Pair v. City of Parker FL Police Dept.*, 383 Fed. Appx. 835, 839 (11th Cir. 2010) ("In general, making arrests [is] part of [an officer's] job-related duties as a law-enforcement officer.").

Sergeant Palmer went to the church to investigate a report of a missing child. (Doc. 38-3, p. 26; Doc. 42, p. 5).  Sergeant Palmer was in the process of finalizing his investigation when he arrested Mr. Scott.  (Doc. 38-14, ¶ 8).  Thus, in arresting Mr. Scott, Sergeant Palmer was acting "within the scope of his authority," "through means that were within his power to utilize."  *Roberts*, 643 F.3d at 903; *Holloman*, 370 F.3d at 1265.  "[B]ut for the alleged constitutional infirmity," Sergeant Palmer's arrest of Mr. Scott would fall within Sergeant Palmer's "legitimate job description." *Holloman*, 370 F.3d at 1266.  Accordingly, the record establishes that Sergeant Palmer was acting within the scope of his discretionary authority when he arrested Mr. Scott.

Once an officer establishes that his actions were within the scope of his discretionary authority, the burden shifts to the plaintiff to establish (i) that the officer violated a constitutional right and (ii) that the right was clearly established at the time of the alleged violation.  *Carter*, 821 F.3d at 1319; *Lee*, 284 F.3d at 1194.  A right is clearly established if its contours are so clear that a reasonable officer would know that what he is doing violates that right.  *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).  The Court examines

whether Sergeant Palmer violated Mr. Scott's clearly established constitutional rights first with respect to Mr. Scott's false arrest claim and then with respect to his excessive force claim.

### 1.     False Arrest

Mr. Scott's false arrest claim pertains to the Fourth Amendment.  The Fourth Amendment guarantees "[t]he right of the people to be secure . . . against unreasonable searches and seizures." U.S. CONST. amend. IV.  An arrest is a "seizure of the person" and must be reasonable, or else it violates the Fourth Amendment.  *See Skop v. City of Atlanta*, 485 F.3d 1130, 1137 (11th Cir. 2007).

Reasonableness is measured by the presence of probable cause.  *Carter*, 821 F.3d at 1319.  Probable cause exists where the totality of the circumstances of which the arresting officer is aware "would cause a prudent person to believe that the suspect has committed, is committing, or is about to commit an offense."  *Carter*, 821 F.3d at 1319 (quoting *Kingsland v. City of Miami*, 382 F.3d 1220, 1226 (11th Cir. 2004)) (internal quotation marks omitted).  Because "'it is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present,'" an official will receive the protection of qualified immunity if he can demonstrate that he had arguable probable cause to make an arrest.  *Carter*, 821 F.3d at 1319–20 (quoting *Anderson v. Creighton,* 483 U.S. 635, 641 (1987)).

Arguable probable cause is different from probable cause and exists where a reasonable officer in the defendant's position could have believed probable cause

existed to arrest. *Carter*, 821 F.3d at 1320. As the Eleventh Circuit explained in *Carter*,

> [t]o determine whether an officer had arguable probable cause, we ask "'whether the officer's actions are objectively reasonable ... regardless of the officer's underlying intent or motivation.'" *Lee,* 284 F.3d at 1195 (quoting *Vaughan v. Cox,* 264 F.3d 1027, 1036 (11th Cir. 2001)). This standard does not shield officers who unreasonably conclude that probable cause exists. *Skop,* 485 F.3d at 1137.

*Carter*, 821 F.3d at 1320. "Where an officer arrests without even arguable probable cause, he violates the arrestee's clearly established Fourth Amendment right to be free from unreasonable seizures." *Id.* (citing *Case v. Eslinger,* 555 F.3d 1317, 1327 (11th Cir. 2009)).

Sergeant Palmer arrested Mr. Scott for obstructing governmental operations. *See* ALA. CODE § 13A-10-2 (1975); (Doc. 50, p. 18). Thus, Sergeant Palmer is entitled to qualified immunity if an officer in his position reasonably could have believed that Mr. Scott had obstructed, was obstructing, or was about to obstruct governmental operations as defined by Alabama Code § 13A-10-2. *See Carter*, 821 F.3d at 1319–20.

Under Alabama law, a person obstructs governmental operations if "by means of intimidation, physical force, or interference or by any other independently unlawful act, he: (1) [i]ntentionally obstructs, impairs, or hinders the administration of law or other governmental function; or (2) [i]ntentionally prevents a public servant from performing a governmental function." ALA. CODE § 13A-10-2 (1975). A

governmental function is "[a]ny activity which a public servant," such as a municipal police officer, "is legally authorized to undertake on behalf of a government." [7]   ALA. CODE § 13A-10-1(2), (3), (7) (1975).

The record viewed in the light most favorable to Mr. Scott shows that he approached Sergeant Palmer and, from a distance of approximately three feet, asked, "[w]hat's going on?"  (Doc. 38-2, pp. 72–73).  Sergeant Palmer responded that Mr. Scott should "[g]et back up yonder and shut up."  (Doc. 38-2, p. 73).  When Mr. Scott asked Sergeant Palmer if he was out of his jurisdiction, Sergeant Palmer replied, "I go anywhere I want to go."  (Doc. 38-2, p. 74).  Mr. Scott then stated, "[y]eah, but this is Franklin County.  We got a county sheriff that, you know, works this part of the county."  (Doc. 38-2, pp. 74-75).  By way of reply, Sergeant Palmer stepped toward Mr. Scott and shoved him backwards with two hands.  (Doc. 38-2, p. 75).  Mr. Scott then stepped back toward Sergeant Palmer and told him, "we got county law down here."  (Doc. 38-2, pp. 76).  Sergeant Palmer then told Mr. Scott that he was under arrest.  (Doc. 38-2, p. 76).

Mr. Scott cites *D.A.D.O. v. State*, 57 So. 3d 798 (Ala. Crim. App. 2009), to support his contention that his conduct before the arrest fell short of that required to

---

[7] Although Mr. Scott argues that Sergeant Palmer's business at the church concluded once he found the missing child, he does not argue that Sergeant Palmer ceased, at that point, performing a governmental function.  In any event, the Court finds no triable issue of fact regarding whether Sergeant Palmer was performing a governmental function under Alabama Code § 13A-10-1(3) in the moments preceding his arrest of Mr. Scott.  Finalizing the details of the child's return home with her neighbors fits squarely within § 13A-10-1(3)'s definition of a governmental function.

establish the crime of obstructing governmental operations.   (Doc. 50, p. 17).   In particular, he cites *D.A.D.O.*'s holding that "words alone fail to provide culpability under § 13A-10-2."   *D.A.D.O.*, 57 So. 3d at 806 ("We hold that § 13A-10-2 does require that the interference be . . . , in part at least, physical in nature.").

Unlike the plaintiff in *D.A.D.O.*, who, while walking away, told the officer in that case, "you don't tell me what to do. . . . I don't like the way you're talking to me," it is undisputed that Mr. Scott took a step toward Sergeant Palmer while reiterating that Sergeant Palmer was outside his jurisdiction.   *D.A.D.O.*, 57 So. 3d at 800–01; (Doc. 38-2, p. 76).   Thus, Mr. Scott's conduct was more than "words alone." *D.A.D.O.*, 57 So. 3d at 800–01, 806.   Mr. Scott's step toward Sergeant Palmer, combined with the words, "we got county law down here," appears to be what the Court in *D.A.D.O.* had in mind when it required "words coupled with conduct sufficient to be physical in nature."   *Id.* at 806; (Doc. 38-2, pp. 75–76).

Based on Mr. Scott's conduct, an officer in Sergeant Palmer's position reasonably could have believed that Mr. Scott intended to physically interfere with Sergeant Palmer's business at the church.   An officer also could have perceived Mr. Scott's reference to "county law" as intimidation, which is, aside from physical interference and "any other independently unlawful act," a means of violating § 13A-10-2.   *See* ALA. CODE § 13A-10-2 (1975); (Doc. 38-2, p. 76).

For these reasons, the Court finds that arguable probable cause existed for Sergeant Palmer to arrest Mr. Scott.  Sergeant Palmer is therefore entitled to qualified immunity and judgment as a matter of law on Mr. Scott's false arrest claim.[8]

### 2.      Excessive Force

Mr. Scott's excessive force claim also concerns the Fourth Amendment.  "The Fourth Amendment's freedom from unreasonable searches and seizures encompasses the plain right to be free from the use of excessive force in the course of an arrest." *Lee*, 284 F.3d at 1197; *see also Mobley v. Palm Beach Sheriff Dep't*, 783 F.3d 1347, 1353 (11th Cir. 2015).  The right to arrest, however, "necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it."  *Graham v. Connor*, 490 U.S. 386, 396 (1989).  Indeed, force and injury are "typical" during an arrest.  *Mobley*, 783 F.3d at 1353 (quoting *Reese v. Herbert*, 527 F.3d 1253, 1272 (11th Cir. 2008)) (internal quotation marks omitted).

A district court evaluates an excessive force claim by asking whether the force used "is objectively reasonable in light of the facts confronting the officer."  *Mobley*, 783 F.3d at 1353 (quoting *Crenshaw v. Lister*, 556 F.3d 1283, 1290 (11th Cir. 2009)) (internal quotation marks omitted).  In making this determination, courts consider "the severity of the crime at issue, whether the suspect poses an immediate threat to the

---

[8] In addition to asserting entitlement to qualified immunity, Sergeant Palmer contends that he had probable cause to arrest Mr. Scott, and he therefore did not violate Mr. Scott's Fourth Amendment rights.  (Doc. 42, p. 24).  Because the Court can resolve Sergeant Palmer's motion for summary judgment on qualified immunity grounds, the Court will not consider whether Sergeant Palmer had probable cause to arrest Mr. Scott.

safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Lee*, 284 F.3d at 1197–98.  Courts also consider "the need for the application of force, . . . the relationship between the need and the amount of force used, and . . . the extent of the injury inflicted." *Id.* at 1198.  The two sets of factors combine to create a proportionality analysis, under which "the force used by a police officer in carrying out an arrest must be reasonably proportionate to the need for that force, which is measured by the severity of the crime, the danger to the officer, and the risk of flight." *Id.*

Based on Mr. Scott's version of the facts, which the Court accepts at this juncture, the record does not demonstrate as a matter of law that Sergeant Palmer used a reasonable amount of force during the arrest.   It is undisputed that Sergeant Palmer arrested Mr. Scott for the Class A misdemeanor offense of obstructing governmental operations, a crime that is not severe.  ALA. CODE § 13A-10-2(c) (1975).  It is also undisputed that at the time of the arrest, Mr. Scott had made remarks that might be viewed as a challenge to Sergeant Palmer's authority and had taken a step toward Sergeant Palmer.  But there is no evidence that Mr. Scott used words that suggested a physical threat to Sergeant Palmer or anyone else. (Doc. 38-2, pp. 75–76).  Moreover, Mr. Scott is in his sixties and was unarmed and non-violent prior to and during the arrest. (Doc. 50, p. 24).  He did not touch Sergeant Palmer before Sergeant Palmer took him to the ground. (Doc. 38-2, pp. 75–76).  Finally, Mr. Scott gave no indication that he intended to flee, and the facts suggest that flight was unlikely. (Doc. 38-2, pp.

17

75, 83).  Measured by these factors, the need for Sergeant Palmer to use force to carry out Mr. Scott's arrest was minimal.

The amount of force Sergeant Palmer used, however, was not minimal.  The evidence shows that Sergeant Palmer grabbed Mr. Scott's arm, twisted it around his back, and handcuffed that wrist.  (Doc. 38-2, p. 83).  Mr. Scott then asked Sergeant Palmer to loosen the handcuff because it was hurting him.  (Doc. 38-2, p. 83).  "Painful handcuffing, without more, is not excessive force in cases where the resulting injuries are minimal."  *Rodriguez v. Farrell*, 280 F.3d 1341, 1351 (11th Cir. 2002).  Here, there was more: rather than loosening the cuff, Sergeant Palmer responded to Mr. Scott's request by taking him to the ground.  (Doc. 38-2, p. 84).

Mr. Scott testified that Sergeant Palmer kicked his legs out from under him.  (Doc. 38-2, p. 84).  Other witnesses describe Sergeant Palmer tripping Mr. Scott (Doc. 38-8, p. 45), taking him to the ground in a "bear hug" (Doc. 38-6, p. 31), or "throw[ing]" Mr. Scott to the ground (Doc. 38-5, p. 63).  Sergeant Palmer argues that Mr. Scott pulled away while he was cuffing him, throwing Sergeant Palmer off balance and causing the two men to fall to the ground.  (Doc. 42, pp. 31–32).  At the summary judgment stage, the Court accepts Mr. Scott's version of events rather than Sergeant Palmer's version and recognizes that a jury must resolve the disputed fact.

Once on the ground, Sergeant Palmer pinned Mr. Scott down while he attempted to cuff Mr. Scott's other arm, which was pinned beneath Mr. Scott.  (Doc. 38-2, p. 88).  Witnesses testified that Sergeant Palmer appeared to be trying to "bury

[Mr. Scott's] face in them [*sic*] gravel," and that Sergeant Palmer was "trying to push [Mr. Scott's head] plumb through the ground." (Doc. 38-11, p. 76; Doc. 38-12, p. 41–42). Mr. Scott testified that he could not breathe and that it was physically impossible for him to give his free arm to Sergeant Palmer. (Doc. 38-2, p. 90). One witness thought Sergeant Palmer was going to kill Mr. Scott and believes Sergeant Palmer was on drugs because he appeared "out of his mind." (Doc. 38-12, p. 52).

A reasonable jury confronted with these facts could find that Sergeant Palmer's use of force was unreasonably disproportionate to the need for it.

Regarding the second prong of the qualified immunity analysis, it is clearly established in the Eleventh Circuit that "gratuitous use of force when a criminal suspect is not resisting arrest constitutes excessive force. *Saunders v. Duke*, 766 F.3d 1262, 1267 (11th Cir. 2014) (quoting *Hadley v. Gutierrez*, 526 F.3d 1324, 1330 (11th Cir. 2008)) (internal quotation marks omitted); *see also Lee*, 284 F.3d at 1200. The evidence viewed in the light most favorable to Mr. Scott shows that Mr. Scott did not resist arrest. (Doc. 38-2, pp. 83–84). Sergeant Palmer told Mr. Scott that he was under arrest, and Mr. Scott replied, "[o]kay." (Doc. 38-2, p. 83). Sergeant Palmer then handcuffed Mr. Scott's arm. (Doc. 38-2, p. 83). When Mr. Scott asked him to loosen the cuff, Sergeant Palmer took Mr. Scott's legs from under him and pinned him to the ground. (Doc. 38-2, pp. 84–86).

Mr. Scott's request that Sergeant Palmer loosen the handcuff cannot reasonably be viewed as resisting arrest. Mr. Scott concedes that it is "a possibility" that he

"tensed up" when Sergeant Palmer handcuffed him.  (Doc. 38-2, p. 84).  Mr. Scott maintains, however, that he did not pull his arm away or do anything that would lead Sergeant Palmer to conclude that he was not complying with the arrest.  (Doc. 38-2, p. 84).  More importantly, once Mr. Scott was on the ground and Sergeant Palmer was on top of him with one arm cuffed behind Mr. Scott, there was no reason for Sergeant Palmer to continue to hit Mr. Scott in the back and press his head into the ground.  An arrestee's right to be free from this level of force during an arrest is clearly established; no reasonable officer with the information available to Sergeant Palmer could have believed that the amount of force that Sergeant Palmer used to arrest Mr. Scott was constitutionally permissible.  *Post v. City of Fort Lauderdale*, 7 F.3d 1552, 1559 (11th Cir. 1993); *see Hadley*, 526 F.3d at 1334 (holding that "punching a non-resisting criminal suspect for no apparent reason other than malice" was a violation of the suspect's clearly established right to be free from excessive force during an arrest).

Although the non-resisting plaintiffs in *Saunders*, *Hadley*, and *Lee* were handcuffed when the officers in those cases applied their force, and Mr. Scott had one arm free when Sergeant Palmer took him to the ground, the Court considers the absence of resistance—not the presence of handcuffs—to be the operative factor in the analysis.  *Saunders*, 766 F.3d at 1267; *Hadley*, 526 F.3d at 1334; *Lee*, 284 F.3d at

1199.   Accordingly, Sergeant Palmer is entitled to neither qualified immunity nor summary judgment on Mr. Scott's excessive force claim.[9]

## B.   Mr. Scott's § 1983 Malicious Prosecution Claim

Mr. Scott alleges that Sergeant Palmer violated his Fourth Amendment rights by subjecting him to malicious prosecution.  *See* U.S. CONST. amend. IV; (Doc. 1, p. 7; Doc. 50, pp. 13, 23).  Eleventh Circuit recognizes "malicious prosecution as a violation of the Fourth Amendment and a viable constitutional tort cognizable under § 1983."  *Grider v. City of Auburn*, 618 F.3d 1240, 1256 (11th Cir. 2010).  To prevail on a claim of malicious prosecution under § 1983, a plaintiff must show: (1) the elements of the common law tort of malicious prosecution, and (2) an unreasonable seizure in violation of his Fourth Amendment rights.  *See Kingsland*, 382 F.3d at 1234 (citing *Wood v. Kesler*, 323 F.3d 872, 881 (11th Cir. 2003), *cert. denied*, 540 U.S. 879 (2003).

When a plaintiff claims malicious prosecution in connection with a warrantless arrest, the requisite unreasonable seizure must take place after arraignment or indictment, be distinct from the underlying arrest, and be "in relation to the prosecution."  *Kingsland*, 382 F.3d at 1235 ("[T]he plaintiff's arrest cannot serve as the predicate deprivation of liberty because it occurred prior to the time of

---

[9] Because, at this stage, the evidence reveals "facts that are inconsistent with qualified immunity being granted, the case and the qualified immunity issue along with it will proceed to trial." *Johnson v. Breeden*, 280 F.3d 1308, 1317 (11th Cir. 2002).  Sergeant Palmer may re-assert his qualified immunity defense, if he wishes, at the close of the plaintiff's case in a Rule 50(a) motion.  *Id.*

arraignment, and was not one that arose from malicious prosecution as opposed to false arrest.") (quoting *Mejia v. City of New York*, 119 F. Supp. 2d 232, 254 (E.D.N.Y. 2000)) (internal quotation marks omitted).

Because the record contains no evidence of a seizure other than the arrest at the church, Mr. Scott does not state a cognizable claim for malicious prosecution, and Sergeant Palmer is entitled to summary judgment with respect to that claim.

### C.   Mr. Scott's state law claims

In addition to his Fourth Amendment claims, Mr. Scott asserts state law claims against Sergeant Palmer for false arrest, assault and battery, and malicious prosecution.  (Doc. 1, ¶¶ 6.4, 6.5, 6.6).  Sergeant Palmer argues he is entitled to summary judgment on each claim because he is entitled to state-agent immunity under Alabama law.  (Doc. 42, p. 38).

As with qualified immunity, state-agent immunity "is a question of law to be decided by the trial court."  *Suttles v. Roy*, 75 So. 3d 90, 99 (Ala. 2010) (quoting *Ex parte Sawyer*, 984 So. 2d 100, 1106–07 (Ala. 2007)) (internal quotation marks and citation omitted).  Under Alabama law, a municipal officer is immune from state tort liability "arising out of his or her conduct in performance of any discretionary function within the line and scope of his or her law enforcement duties."  ALA. CODE. §6-5-338(a) (1975).  This immunity applies "when the conduct made the basis of the claim against the [officer] is based upon the [officer's] . . . exercising judgment in the enforcement of the criminal laws of [Alabama], including, but not limited to, law-

enforcement officers' arresting or attempting to arrest persons . . . ." *Hollis v. City of Brighton*, 950 So. 2d 300, 309 (Ala. 2006).  An officer is not entitled to discretionary function immunity when the officer "acts willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law." *Howard v. City of Atmore*, 887 So. 2d 201, 205 (Ala. 2003) (quoting *Ex parte Cranman*, 792 So. 2d 392, 405 (Ala. 2000)).

Analysis of discretionary function immunity under Alabama law is analogous to that of federal qualified immunity.  An officer asserting discretionary function immunity "bears the burden of demonstrating that the plaintiff's claims arise from a function that would entitle [the officer] to immunity."[10]  *Ex parte Kennedy*, 992 So. 2d 1276, 1282 (Ala. 2008) (citing *Ex parte Estate of Reynolds*, 946 So. 2d 450, 452 (Ala. 2006)).  If the officer does that, then the burden shifts to the plaintiff to show that the officer is not entitled to state-agent immunity.  *Ex parte Kennedy*, 992 So. 2d at 1252.  Mr. Scott argues that Sergeant Palmer is not entitled to immunity because he acted "willfully, maliciously, in bad faith, [or] beyond his authority."  (Doc. 50, p. 32); *See Ex parte Cranman*, 792 So. 2d at 405.

---

[10] Mr. Scott does not dispute, and there is no doubt, that Sergeant Palmer was performing a discretionary function when he arrested Mr. Scott.  *Swan v. Hueytown*, 920 So. 2d 1075, 1079 (Ala. 2005) ("[A]rresting a person is an exercise of judgment—a 'discretionary function'—and therefore, clothes the officer in State-agent immunity.") (citing *Cranman*, 792 So. 2d at 405 and *Telfare v. City of Huntsville*, 841 So. 2d 1222, 1228 (Ala. 2002)).  Likewise, when Sergeant Palmer filed the subsequent complaint and warrant on Mr. Scott, he was "exercising judgment in the enforcement of the criminal laws of the State."  *Ex parte Tuscaloosa County*, 796 So. 2d 1100, 1106 (Ala. 2000) (quoting *Ex parte Cranman*, 792 So. 2d at 405); (*See* Doc. 38-3, pp. 86, 88).

To begin, Sergeant Palmer did not act beyond his authority at any time relevant to the Court's state-agent immunity analysis.  "A State agent acts beyond authority and is therefore not immune when he or she fail[s] to discharge duties pursuant to detailed rules or regulations, such as those stated on a checklist." *Ex parte Walker*, 188 So. 3d 633, 635 (Ala. 2015) (quoting *Ex parte Estate of Reynolds*, 946 So. 2d at 452, in turn quoting *Giambrone v. Douglas*, 874 So. 2d 1046, 1052 (Ala. 2003), in turn quoting *Ex parte Butts*, 775 So. 2d 173, 178 (Ala. 2000)) (internal quotation marks omitted) (alteration provided by *Giambrone*).  This is a narrow exception.  Mr. Scott argues that because Sergeant Palmer acted outside the Constitution when arresting him, Sergeant Palmer acted beyond his authority under *Cranman*.  (Doc. 50, p. 32).  The Court disagrees.  If *Cranman*'s "beyond his or her authority" exception were read to exclude from immunity any act that a plaintiff alleges is unconstitutional, then the doctrine of state-agent immunity would have virtually no effect.  Mr. Scott has offered no evidence that Sergeant Palmer failed to discharge duties pursuant to detailed rules or regulations, such as those stated on a checklist.  *See Ex parte Walker*, 188 So. 3d at 635.  Therefore, Sergeant Palmer did not act beyond his authority such that he forfeits his immunity under § 6-5-338.

Whether Sergeant Palmer acted willfully, maliciously, or in bad faith is a less obvious matter.  The Court will examine the question with respect to each of Mr. Scott's state law claims.

### 1.    False Arrest

The evidence does not show that Sergeant Palmer acted willfully, maliciously, or in bad faith with respect to Mr. Scott's false arrest claim.  As noted above, Sergeant Palmer had arguable probable cause to arrest Mr. Scott.  *See supra*, p. 16.  That is, a reasonable officer in Sergeant Palmer's position could have believed that probable cause existed to arrest Mr. Scott.  *Carter*, 821 F.3d at 1320.  In the false arrest context, the Alabama Supreme Court considers the presence of arguable probable cause irreconcilable with allegations of malice or bad faith.  *See Borders v. City of Huntsville*, 875 So. 2d 1168, 1180 (Ala. 2003) ("embracing the concept of arguable probable cause" in determining whether an officer is entitled to state-agent immunity on a plaintiff's false arrest claim); *Ex parte Harris*, ---So. 3d---, 2016 WL 4204837, *9 (Ala. 2016) ("Because [the officer] had arguable probable cause to arrest [the plaintiff], we cannot say that he acted 'willfully, maliciously, fraudulently, [or] in bad faith' so as to remove him from the umbrella of State-agent immunity afforded him under *Ex parte Cranman*.").  Because arguable probable cause existed for Sergeant Palmer to arrest Mr. Scott, Sergeant Palmer did not act willfully, maliciously, or in bad faith.  He is therefore entitled to state-agent immunity and summary judgment on Mr. Scott's false arrest claim.

### 2.    Assault and Battery

Sergeant Palmer is not entitled to state-agent immunity with respect to Mr. Scott's assault and battery claim.  "Under Alabama law, excessive force during an

arrest constitutes assault and battery." *Ruffino v. City of Hoover*, 891 F. Supp. 2d 1247, 1279 (N.D. Ala. 2012) (citing *Franklin v. City of Huntsville*, 670 So. 2d 848, 852–53 (Ala. 1995)).   In making an arrest, a police officer may use a reasonable amount of force, but "may be held liable [ ] if more force is used than is necessary to effectuate the arrest." *Franklin*, 670 So. 2d at 852 (citing ALA. CODE 1975 § 13A-3-27 and *Livingston v. Browder*, 285 So. 2d 923 (Ala. Civ. App. 1973)).   As discussed above, the evidence viewed in the light most favorable to Mr. Scott shows that Sergeant Palmer used more force than was necessary to effectuate Mr. Scott's arrest. *See supra*, pp. 17–20.   The Court thus declines to find as a matter of law that Sergeant Palmer did not act willfully, maliciously, or in bad faith when he took Mr. Scott's legs out and pinned him to the ground.   Accordingly, Sergeant Palmer is not entitled to state-agent immunity, and the Court denies Sergeant Palmer's motion for summary judgment with respect to Mr. Scott's assault and battery claim.

### 3.   Malicious Prosecution

To prevail on his malicious prosecution claim, Mr. Scott must show (1) that Sergeant Palmer initiated a prior judicial proceeding against him, (2) that in the prior proceeding Sergeant Palmer acted without probable cause and with malice, (3) that the prior proceeding ended in Mr. Scott's favor, and (4) damages. *Delchamps, Inc. v. Bryant*, 738 So. 2d 824, 831–32 (Ala. 1999).   Generally, malice may be inferred from a lack of probable cause, but the Alabama Supreme Court "has recognized that malice in law, or legal malice, for purposes of a malicious-prosecution claim, is not sufficient

to defeat a state agent's defense of discretionary-function immunity." *Ex parte Tuscaloosa County*, 796 So. 2d at 1107.  Rather, Mr. Scott must prove that Sergeant Palmer's conduct was "so egregious as to amount to willful or malicious conduct or conduct engaged in in bad faith, by, for example, showing that [Sergeant Palmer] had a personal ill will against [Mr. Scott] and that he maliciously or in bad faith arrested him solely for purposes of harassment." *Id.* (quoting *Couch v. City of Sheffield*, 708 So. 2d 144, 153–54 (Ala. 1998)) (internal quotation marks omitted).  That is, Mr. Scott must present "substantial evidence of malice in fact, or actual malice." *Ex parte Tuscaloosa County*, 796 So. 2d at 1107.

Mr. Scott has presented no evidence that Sergeant Palmer had a personal ill will against him or that Sergeant Palmer maliciously or in bad faith arrested him solely for purposes of harassment.  Accordingly, Sergeant Palmer is entitled to state-agent immunity and judgment as a matter of law on Mr. Scott's malicious prosecution claim.

### D.    Mrs. Scott's state law claim of outrage

To prevail on her claim of outrage, also known as intentional infliction of emotional distress, Mrs. Scott must show that Sergeant Palmer's conduct "(1) was intentional or reckless; (2) was extreme and outrageous; and (3) caused emotional distress so severe that no reasonable person could be expected to endure it." *Ex parte Bole*, 103 So. 3d 40, 52 (Ala. 2012) (quoting *Green Tree Acceptance, Inc. v. Standridge*, 565 So. 2d 38, 44 (Ala. 1990)) (internal quotation marks omitted).  "The

27

tort of outrage is an extremely limited cause of action" and requires conduct "so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society." *Ex parte Bole*, 103 So. 3d at 53 (internal quotation marks and citations omitted).

Mrs. Scott argues that Sergeant Palmer engaged in such conduct when he "manhandled" Mr. Scott, pushed Mr. Scott's head into the gravel, kneed Mr. Scott in the back, and threatened to use his Taser on Mr. and Mrs. Scott—all at the Scotts' "place of worship, in the presence of their friends and grandchildren." (Doc. 50, pp. 34–35). The Court sympathizes with Mrs. Scott and recognizes that witnessing her husband's arrest was undoubtedly a stressful ordeal. However, Sergeant Palmer's alleged conduct does not rise to the level of outrage under Alabama law. *See Sheth v. Webster*, 145 F.3d 1231, 1234–35, 1240 (11th Cir. 1998) (affirming the district court's grant of summary judgment on a plaintiff's outrage claim where an officer kneed the plaintiff in the stomach, pushed her against a soda machine, handcuffed her, and dragged her to the police car, even though she posed no threat). Accordingly, Sergeant Palmer is entitled to judgment as a matter of law on Mrs. Scott's outrage claim.

## IV.   CONCLUSION

For the reasons discussed above, the Court **GRANTS** Sergeant Palmer's motion for summary judgment with respect to Mr. Scott's claims for false arrest and

malicious prosecution under 42 U.S.C. § 1983 and Alabama law, and with respect to Mrs. Scott's claim for outrage under Alabama law.  These claims are **DISMISSED WITH PREJUDICE**.

The Court **DENIES** Sergeant Palmer's motion for summary judgment with respect to Mr. Scott's claims for excessive force under 42 U.S.C. § 1983 and assault and battery under Alabama law.  The Court asks the Clerk to please **TERM** Doc. 41.

**DONE** and **ORDERED** this September 27, 2016.

_____
**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE